**UNITED STATES of America ex rel. Jesse OWENS, Petitioner-Appellant,**

v.

**John J. TWOMEY, Warden, Illinois State Penitentiary, Joliet Branch, Respondent-Appellee.**

**No. 74–1122.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 14, 1974.

Decided Dec. 31, 1974.

Gerald R. Turner, Milwaukee, Wis., for petitioner-appellant.

William J. Scott, Atty. Gen., Donald Hubert, Thomas Connors, Asst. Attys. Gen., Chicago, Ill., for respondent-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and FAIRCHILD, Circuit Judge.

HASTINGS, Senior Circuit Judge.

A federal district court denied, without an evidentiary hearing, the *pro se* petition for a writ of habeas corpus filed by a state court prisoner. The prisoner has appealed. We have elected to examine the underlying state court record in its entirety and determine the ultimate issues raised on their merits. This will require a rather detailed statement of the factual and procedural background of the underlying state court proceedings. The following narrative is fully supported by the record.

On the night of June 23, 1966, about 11:30 p. m., one Jesse Owens knocked on the door of an apartment occupied by Jimmy Lugo and his family in the City of Chicago. The family consisted of a large number of children, the youngest being one year old. One of the sons heard the knock and was falsely informed by the caller that he was a policeman. The boy reported this to his father who told him to admit the caller. The door was opened and Owens, not a policeman, entered with a drawn gun and demanded to know if the father, Jimmy Lugo, was a man named Gonzales. When told that no one by that name lived there, Owens again drew his gun and started searching the house. He pointed his gun at the one-year-old baby and threatened to shoot it. The mother became frightened and ran out the front door of the apartment followed by her husband and several of the older children. To no avail Owens ordered the mother to return. Except for several small children still in bed, the only other person remaining in the bedroom with the baby was the fourteen-year-old daughter, Lucy Lugo, dressed in her night clothes.

Owens grabbed Lucy by the arm and dragged her out the back way onto a porch and ordered her to jump to the ground where he had just alighted. She followed him as ordered. He took her with him by force into an alley behind the apartment.

In the meantime, the Lugos' son ran into the street from the apartment and stopped a passing police car. He gave the law enforcement officer a description of Owens. The officer entered the apartment shortly after Owens had fled with the daughter Lucy.

During this time Owens forcibly took Lucy down the alley and on to Augusta Boulevard where he came upon a man, Raymond Goveia, who was parking his car and about to enter his home. Owens asked for a "lift" and Goveia inquired, "where to?" Owens then pulled out his gun and ordered Goveia to get back into his car in the driver's seat and ordered Lucy to sit in the front seat beside the driver. Owens got in the back seat, pointed his gun to the back of Goveia's head and ordered him to start driving the car around, saying, "Drive off and don't try nothing funny, or I'll blow your brains out." Goveia replied, "Mister you can have my car, clothes, anything you want, but don't get excited."

The car proceeded in and out of alleys under demands by Owens. Owens asked Goveia if he had any tape, to which Goveia replied in the affirmative. Owens ordered Goveia to stop the car, and all three persons got out. Goveia produced some tape from the trunk of his car and handed it to Owens. After traveling through more alleys, Owens, holding the gun against the back of Goveia's head, ordered him to stop again in an alley. All three persons got out of the car again and Owens gave Lucy the tape and ordered her to tape Goveia's hands behind his back and to tape his mouth shut. After Owens said that he would

kill Goveia if he was not taped tight around the wrists, Lucy put on more tape. They reentered the car; Owens ordered Goveia to lie on the floor of the back seat; Owens took the driver's seat and ordered Lucy to sit beside him.

The car was again driven through alleys and Owens ordered Lucy to undress, and then she began to cry. Owens said to her, "You're not cooperating with me. I'm going to have to kill you." She undressed. Owens stopped the car and sexually assaulted her. Periodically thereafter, throughout the night, Owens would stop the car and sexually attack Lucy, perhaps ten times, although such succeeding acts of sexual intercourse were not successfully completed. Thereafter, under Owens' orders, Lucy removed Goveia's wallet from his back pocket and handed it and the money in it (something more than $50) to Owens.

As dawn was approaching, Owens told them that the police would be looking for Lucy so he had to get them off the street. After two telephone calls from public phone booths, Owens told them he would take them to an apartment where his lady friend lived and told them to act friendly toward him. In the interim, he had Lucy wipe herself with a napkin taken from the glove compartment in the car. Also, Owens removed the tape which had been used to bind and gag Goveia. Goveia was permitted to sit erect in the back seat of the car, but with his hands up on top of the back seat.

About 6:00 a. m. they stopped and entered an apartment in Chicago where they were met by a woman, Marion Short. Owens was living there with Marion as his common-law wife. Goveia used the washroom under Owens' supervision. Lucy sat on a bed. Goveia believed he was going to be killed and asked for a Bible, which Marion gave him. Owens began listening to radio programs and finally heard a program broadcast that a search was in progress for Lucy and her abductor. Marion accidentally bumped into Owens and felt a hard object and asked what it was. Ow-

ens pulled out the gun and told her he would have to use it against Lucy and Goveia. Marion begged him not to do that and to let them go free. She also refused to accept any of the money taken from the wallet and told him to return it to Goveia. During this time Marion referred to Owens as Jesse.

About 6:30 a. m. Owens finally decided to let them go free, saying he was sorry for what had happened. Marion left to go to work and Lucy and Goveia drove away in Goveia's car. While driving home Goveia waved down a police car. Goveia and Lucy were taken to Lucy's home where there were about 20 police squad cars. Lucy was then taken to Mount Sinai Hospital for an examination. This physical examination revealed a tear on the hymen a few hours old.

Goveia was transported to the police station where for an hour he told what had happened, gave a description of Owens and the location of the Short apartment. Later Goveia was returned to the apartment building and interrogated by the police. While there, the police located the janitor of the apartment building, James Hussion, who told them that Marion Short was renting the apartment. Subsequently, she admitted that she was living there with Owens.

Later, during the trial, it was stipulated that Owens' fingerprint was the one taken from Goveia's car and that a pair of Owens' trousers and jockey shorts underwear were stained with blood.

Following a bench trial, Owens was convicted of the rape and aggravated kidnapping of Lucy Lugo and of the armed robbery and aggravated kidnapping of Raymond Goveia in the Circuit Court of Cook County, Illinois. Owens was sentenced to concurrent terms of not less than 30 nor more than 40 years in the Illinois state penitentiary on each offense. No appeal was taken from the convictions involving Goveia.

Owens' judgment of conviction for the rape and aggravated kidnapping of Lucy Lugo was affirmed on appeal, People v. Owens, 133 Ill.App.2d 44, 272 N.E.2d 858 (1971). The court held that Owens was

proved guilty beyond a reasonable doubt on the charge of rape and aggravated kidnapping and that the sentence imposed was not excessive. The Supreme Court of Illinois denied leave to appeal. Subsequently, Owens appealed to the Illinois Supreme Court from the judgment of the Circuit Court of Cook County, dismissing without an evidentiary hearing his amended petition filed pursuant to the Post-Conviction Hearing Act, Ill.Rev. Stat.1967, ch. 38, ¶ 122–1 et seq. The Illinois Supreme Court held that the trial court did not err in denying Owens an evidentiary hearing, and affirmed. People v. Owens, 54 Ill.2d 286, 296 N.E.2d 728 (1973). There the affirmance and subsequent dismissal was grounded upon the merits of the unlawful search claim and harmless error. The court stated: "We do not consider the question of waiver and elect to review the record and decide the issue on the merits." 54 Ill.2d at 290, 296 N.E.2d at 731.

At this juncture it should be noted that Owens was competently represented throughout the state court proceedings by counsel.

Pursuant to leave granted, Owens filed his *pro se* petition, *in forma pauperis*, for a writ of habeas corpus in the United States District Court for the Northern District of Illinois, the Honorable James B. Parsons, Judge, presiding. The petition was fully completed in the form prescribed by the rules of the district court for persons in state custody. Owens also filed a supporting brief and argument.

On August 31, 1973, based on an examination of the habeas petition, without an evidentiary hearing, the district court denied Owens relief "on the grounds that he failed to exhaust his state judicial remedies and had not stated a claim upon which relief in the federal district court could be granted." On January 15, 1974, the court below denied petitioner's motions for rehearing and for a certificate of probable cause. The instant appeal followed.

We appointed competent counsel to represent petitioner in this appeal and he has exercised due diligence in discharging this responsibility.

## EXHAUSTION OF STATE JUDICIAL REMEDIES

The federal district court denied relief on the habeas petition, as indicated above, first "on the grounds that he failed to exhaust his state judicial remedies."[1]

As above set out, petitioner's conviction for rape and aggravated kidnapping of Lucy Lugo was affirmed on appeal by the Illinois Appellate Court, People v. Owens, 133 Ill.App.2d 44, 272 N.E.2d 858 (1971). The questions there were limited to the sufficiency of the evidence and the excessiveness of the penalty. However, in his subsequent appeal to the Supreme Court of Illinois, People v. Owens, 54 Ill.2d 286, 296 N.E.2d 728 (1973), from the judgment of the Circuit Court of Cook County dismissing, without an evidentiary hearing, his amended petition filed pursuant to the Illinois Post-Conviction Act, *supra*, other issues were raised by petitioner and considered by that high tribunal. We quote from that opinion:

The allegations of violations of his constitutional rights with respect to which petitioner contends that he was entitled to an evidentiary hearing are

---

1. The relevant part of Title 28, U.S.C. § 2254, as amended Nov. 2, 1966, Pub.L. 89–711, § 2, 80 Stat. 1104, reads:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

(a) that his in-custody identification as the perpetrator of the crimes was made under impermissibly suggestive circumstances; (b) that a search of his apartment without a search warrant violated his constitutional rights and certain evidence thus obtained was the tainted fruit of the unlawful search; and (c) that certain erroneous rulings on the admissibility of evidence at his trial were not, beyond a reasonable doubt, harmless error. *Id.* at 287–288, 296 N.E.2d at 729.

Setting aside for the moment the merits of the search and seizure question, we revert to the exhaustion doctrine.

In the oft-cited and, on some propositions, bitterly disputed but surely historic opinion in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), certain basic principles seem to have been established. The court noted that under Section 2254 a state prisoner is barred from federal habeas corpus review of his conviction unless he "has exhausted the remedies available in the courts of the State" by any available procedure and then examined the provision's legislative history. It held that, where on direct review of his conviction, a state prisoner's claim of a federal constitutional right has been decided adversely to him by the state supreme court and an application to the Supreme Court for certiorari has been denied, that he has satisfied the state court exhaustion requirement. *Id.* at 446–450, 73 S.Ct. 397. Under such circumstances it is not necessary that he pursue in the state courts a collateral remedy based on the same evidence and issues. *Id.* at 447–450, 73 S.Ct. 397. Section 2254 does not require repetitious applications to state courts for relief. *Id.* at 448–449, n. 3, 73 S.Ct. 397; Roberts v. LaVallee, 389 U.S. 40, 42–43, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967).

In a different context, Mr. Justice Brennan, speaking for the Court in Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), after a succinct review of a parade of the Court's prior holdings, concludes "that the substance of a federal habeas corpus claim must first be presented to the state courts." *Id.* at 278, 92 S.Ct. at 513. In Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), Mr. Justice Marshall, speaking for the Court in a different factual setting, noted that "not every state procedural default bars federal habeas corpus relief," and that the exhaustion requirements "are limited in their application to those state remedies still open to the habeas applicant at the time he files his application in federal court," citing Fay v. Noia, 372 U.S. 391, 434–435, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) and Picard v. Connor, 404 U.S. 270, 272 n. 3, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). 405 U.S. at 516, 92 S.Ct. 1048. And then, apropos the instant appeal, the Court said: "In this case it appears that petitioner has met the requirements of the exhaustion rule, inasmuch as no direct appeal is presently available to him, and *he has taken his claim for post-conviction relief to the highest state court.*" *Id.* (Footnote omitted. Emphasis added.)

It is well settled that a basic consideration giving rise to the enactment and development of the exhaustion requirements was the desire to alleviate the wounds engendered by the authority given one federal district judge to set aside or otherwise infringe upon a state court conviction. Fay v. Noia, 372 U.S. 391, 419–420, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). Furthermore, the issuance of the writ being a discretionary matter, the exhaustion requirement is not deemed to be jurisdictional. See United States ex rel. Curtis v. Warden of Green Haven Prison, 2 Cir., 463 F.2d 84, 86 (1972). This would seem to make the case at bar one where *inter alia*, it is "neither necessary nor appropriate to resolve the delicate question of federal-state comity in this instance but instead proceed to the merits." *Id.*

There is authority for the proposition that the exhaustion requirement for federal habeas corpus applies only to direct state appeals, and not to collateral post-conviction relief. United States ex rel.

Ross v. LaVallee, 2 Cir., 448 F.2d 552, 553–554 (1971). There the state prisoner had presented his claim to the state's highest court and that court had refused to hear it. In the instant appeal, it is significant that after the affirmance of Owens' conviction by the Illinois Appellate Court, he sought relief in the Supreme Court of Illinois and that court denied leave to appeal. The reasons for denying such relief are not relevant. The critical factor in a federal habeas corpus proceeding is that his claim was presented to that state court. And, as *Ross* notes, the exhaustion requirements do not apply to Owens' postconviction hearing where the other issues hereinabove set out were presented to and determined by the Illinois Supreme Court.

■ In support of the judgment of dismissal of petitioner's habeas petition, the state now seeks to raise for the first time on appeal an issue not presented to the federal district court. We agree with the state that a new argument in support of a judgment on appeal may be presented. Dandridge v. Williams, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). The state now urges that the petition should have been dismissed on the ground that the petitioner failed to raise his search and seizure issue at the trial court or on direct review in the state courts. The state further argues that the petitioner's failure to raise the issue was a matter of deliberate trial strategy since his defense was predicated on the contention that Lucy Lugo voluntarily consented to have sexual relations with him and, further, that Lucy and Goveia voluntarily agreed to go with him in Goveia's car. Although petitioner agrees that his defense was based on consent, he says that his failure to raise the issue was not a matter of trial strategy, but was due to the fact that it was only after the trial that the issue was discovered. It is the state's argument that there was a waiver of the defense of the exclusionary rule which should bar federal collateral attack under the authority of our recent holding in United States ex rel. Allum v. Twomey, 7 Cir., 484 F.2d 740 (1973).

■ We again observe that the Supreme Court of Illinois, in considering petitioner's contentions arising from the allegedly unlawful search of his apartment and the People's position that the error, if any, was waived by reason of the failure of trial counsel to move to suppress the unlawfully seized evidence, refused to consider the question of waiver and elected to review the record and decide the issue on the merits, People v. Owens, 54 Ill.2d 286, 290, 296 N.E.2d 728, 731 (1973).

In light of our review of the holdings hereinbefore set out based on the peculiar circumstances present in the case at bar, we choose to take a different course from that followed in *Allum*. Rather than posit our determination of the exhaustion of remedies problem on the doctrine of waiver found in *Allum*, and since we subsequently reach a result based on the merits of Owens' claims, we have elected, as did the Illinois Supreme Court, to decide the case on the merits.

■ Based upon our consideration of the doctrine of the exhaustion of state court remedies, we find and hold that petitioner Owens exhausted such remedies and that the federal district court erred in holding to the contrary.

## DID THE HABEAS PETITION STATE A FEDERAL CLAIM?

The district court dismissed petitioner's federal habeas corpus petition on the additional ground that it did not state "a claim upon which relief in the federal district court could be granted." It did not further elaborate on this holding.

■ At the outset, petitioner claims there was an illegal search of the apartment where he resided. He finds support in the holding of the Illinois Supreme Court in People v. Owens, 54 Ill.2d 286, 290, 296 N.E.2d 728, 731 (1973). There the court said: "An examination of the record shows that the search of the apartment in which petitioner resided was made without a search warrant and there is no evidence of exigent circumstances which would excuse obtaining a warrant." *Id.* We

agree. The state court record supports this finding.

Nevertheless, the court immediately followed this with the statement: "The record, however, shows beyond a reasonable doubt that any evidence obtained in the illegal search was either not offered in evidence or, if admitted, was harmless." 54 Ill.2d at 290, 296 N.E.2d at 731. We shall subsequently examine this conclusion in light of our own review of the state court record.

Petitioner asserts that the items unlawfully seized in the search of his apartment were a photograph of himself and a small booklet containing the work address of his girl friend, Marion Short. It necessarily follows, he contends, that these items had as their poisonous fruit the following evidence admitted at the trial: (a) the in-court identification testimony by Goveia, in that Goveia had previously viewed the illegally seized photograph of Owens, and (b) that the testimony of Marion Short was prejudicially tainted in that she was first located through the use of her work address from the illegally seized booklet. Petitioner makes the further contention (c) that his fingerprint on Goveia's automobile and his blood-stained trousers were obtained as an incident of an illegal arrest, since the probable cause for his arrest was established by Goveia's identification of petitioner's illegally seized photograph.

The state contends, as the Illinois Supreme Court found, that the record clearly indicates that there was no evidence admitted at trial which was either seized at the apartment or was the fruit of the evidence which was seized.

The Supreme Court has held that the exclusionary rule has no application when the government learned of the evidence "from an independent source." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

In Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939), the Court recognized that as in *Silverthorne*, "the facts improperly obtained do not 'become sacred and inaccessible,'" if knowledge of them is gained from an independent source. It put a gloss on its statement by saying: "As a matter of good sense, however, such connection [between illicit wire-tapping and the government's proof] may have become so attenuated as to dissipate the taint." *Id.*

Both parties here cite and rely upon Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In *Wong Sun*, the Court recognized and cited the *independent source* test established in *Silverthorne Lumber Co.* and the *attenuated basis* test laid down in *Nardone.* 371 U.S. at 487, 83 S.Ct. 407. It then added a third dimension, sometimes referred to as the *inevitability* test. It said:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959). *Id.* at 487–488, 83 S.Ct. at 417.

In short, as the state succinctly puts it, there have evolved three tests from *Wong Sun*, any one of which, when applicable, establishes that the controverted evidence is not fruit of the poisonous tree when: (1) the evidence was discovered by an independent source; (2) the evidence is sufficiently distant in causal connection from the illegal search and seizure so that the connection has become so attenuated as to dissipate the taint; or (3) the evidence inevitably would have been gained even without the unlawful search.

In United States v. Piet, 7 Cir., 498 F.2d 178, 181 (1974), our court, speaking through Senior Circuit Judge Castle, held that when an independent basis existed to support an F.B.I. agent's suspi-

cion that the goods were being stolen at a facility prior to a first allegedly unlawful search, this did not taint a second search and seizure. See also, United States v. Hoffman, 7 Cir., 385 F.2d 501, 504–505 (1967), cert. denied, 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968). These cases establish that we have recognized the independent source test.

Our court has also come to recognize and apply the attenuated basis test. United States v. Balistrieri, 7 Cir., 403 F.2d 472, 475–477 (1968), vacated and remanded on other grounds, 395 U.S. 710, 89 S.Ct. 2032, 23 L.Ed.2d 654 (1969). In a carefully considered review of *Silverthorne, Nardone* and *Wong Sun, supra,* our then Chief Judge Castle wrote that certain evidence submitted by the government was not "come at by exploitation" of the information obtained in the illegal searches and seizures, but "by means sufficiently distinguishable to be purged of the primary taint." 403 F.2d at 476. As to other evidence showing a causal connection between the electronic eavesdropping and the government's proof, it was found that " 'such connection has become so attenuated' . . . as to dissipate the taint." *Id.* at 477. See also United States v. Ruffin, 7 Cir., 389 F.2d 76, 79–80 (1968); United States v. Hoffman, *supra,* 385 F.2d at 504–505.

We have not had occasion to pass directly on a case involving the so-called inevitability test. However, the citation and quotation from Maguire in *Wong Sun, supra,* 371 U.S. at 480, 83 S.Ct. 407, quoted by our court in *Balistrieri, Ruffin* and *Hoffman, supra,* leave little doubt that we would not do other than to follow this lead.

We now apply these tests to the facts established by the state court record in this case.

■ It was clearly shown that Goveia was in the company of Owens from about midnight until 6:30 a. m. on the morning of June 23, 1966, immediately following Owens' departure from the Lugo apartment. He was face to face with Owens during the forced ride in Goveia's car from the time Owens first pointed a gun at him and ordered him to drive away, and also when Owens forced Lucy Lugo to bind and gag him, and as he listened to Lucy's cries during the rapes committed on her. Finally, Goveia was with Owens for the trip to the Short apartment and the stay there until his release after Marion's pleas. These facts were corroborated by Lucy and Marion Short as previously shown. Thus, it is apparent that even if the photograph did give Goveia some sense of an image of Owens, it could not have affected his in-court identification of Owens in any significant manner. The in-court identification was the product of an independent source and not the fruit of a poisonous tree.

■ In a similar vein, it was clearly established that Marion Short was living with Owens and witnessed the early morning visit of Goveia and Lucy at the apartment. Marion said in the presence of all that she was leaving to go to work. Her name and place of residence were known at that time. Goveia testified he could recall the location and address of the apartment. He gave a full account of the details to the police prior to the illegal search. The police learned from the janitor of the building where Owens and Marion lived. All this was made known to the police and Marion's identity was clearly established prior to the search, notwithstanding that her work address was subsequently obtained from the booklet seized during the search. It thus appears that the effective cause of the police establishing the identity of Marion Short were these leads. It was inevitable that her identity would have been revealed without her work address in the booklet. Both the independent source test and the inevitability test have been satisfied here. Marion Short's identity and testimony were not the fruit of the poisonous tree.

■ It is also clear that the police had obtained sufficient facts to establish probable cause for the arrest of Owens, aside from and prior to the information obtained as a result of the illegal search.

This should satisfy the admission of the fingerprint taken from Goveia's car. It was stipulated in evidence that Detective Patrick Angelo obtained the blood-stained pants and jockey shorts from Owens. In Owens' brief filed in the federal district court he states that his pants and underwear were seized by Detective Angelo at the Maxwell Street station upon his arrest. Since the arrest was valid, the introduction of these items was permissible as evidence obtained incidental to such arrest. Neither the fingerprint nor the pants and underwear were tainted by the search of the Marion Short apartment. Such items of evidence were not the fruit of the poisonous tree.

We need not further prolong this extended discussion.

For the foregoing reasons the order of the district court dismissing the instant habeas corpus petition without a hearing is affirmed.

Affirmed.