UNITED STATES of America,
Plaintiff-Appellee,

v.

Andrew B. CARSELLO,
Defendant-Appellant.

No. 77–1979.

United States Court of Appeals,
Seventh Circuit.

Argued April 4, 1978.

Decided June 30, 1978.

**200**

Julius L. Echeles, Chicago, Ill., for defendant-appellant.

Robert D. Rose, Special Atty., Dept. of Justice, Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, BAUER, Circuit Judge, and VAN PELT, Senior District Judge.[*]

BAUER, Circuit Judge.

In a seven-count indictment returned July 8, 1976, defendant-appellant Carsello was charged with four violations of 26 U.S.C. § 7206(1) for having filed false income tax returns, and with three violations of 18 U.S.C. § 1510 for having attempted to obstruct the course of a federal investigation. Counts 1 through 3 alleged that Carsello had failed to report a substantial amount of interest income for the 1970 through 1973 tax years. Counts 2 through 4 alleged the failure to report a substantial amount of gross income received by Carsello's wholly owned Grand Sanitation and Supply Company during the same tax years. Counts 5 through 7 alleged that Carsello had interfered with the course of a federal investigation into tax and loan-sharking violations by attempting to obstruct the flow of information from three persons to federal agents.

Following the suppression of certain usury records illegally obtained from the defendant, the Government announced that it would offer no proof on Counts 1, 5 and 6 of the indictment, and would limit its proof of Counts 2 and 3 to the defendant's failure to report gross business receipts. Counts 1, 5 and 6 were thereupon dismissed by the district court. A bench trial of the remaining counts resulted in an acquittal on Count 7 and convictions on Counts 2 through 4. Carsello was then sentenced to concurrent terms of 18 months' imprisonment on the three tax fraud counts.

On appeal, Carsello argues that, in addition to suppressing the usury records illegally obtained from him, the district court also should have suppressed certain invoices and cancelled checks allegedly obtained by exploitation of information gleaned from the illegally seized usury records. In short, he argues that the cancelled checks and invoices used to prove his failure to report gross income from his legitimate business enterprise were the "fruit" of the illegal seizure of his usury records and therefore should have been suppressed under *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We disagree and affirm the district court's judgment for the reasons noted below.

I.

The facts relevant to the suppression issue before us are as follows: On March 5, 1974, Chicago police officers executed a search warrant at defendant's home that

---

[*] The Hon. Robert Van Pelt, United States District Court for the District of Nebraska, is sitting by designation.

called for seizure of "records of wagers on horse races, scratch sheets and other paraphernalia used, kept or provided for the illegal act of gambling." In the course of executing the warrant, the officers found nothing relevant to their gambling investigation, but did seize a set of records that appeared to reflect usurious transactions. Upon returning to the police station, the officers summoned agents of the Federal Bureau of Investigation and the Internal Revenue Service, who examined the books seized and determined that they were in fact usury records.

Subsequently, state charges of criminal usury were brought against Carsello, but later dismissed when the state court suppressed the usury records because they were outside the scope of the search warrant the Chicago police officers were executing at the time they seized the records.

Meanwhile, the Federal Bureau of Investigation was conducting its own investigation of possible extortionate credit transactions involving Carsello. From photocopies of the usury records made immediately after their seizure, the agents obtained a list of persons who may have been involved in usurious transactions with the defendant. Interviews with those persons, however, proved fruitless and the investigation was terminated in September 1974 without any charges being filed against Carsello.

The Internal Revenue Service then began an active investigation to determine whether the defendant had failed to report interest income on his recent federal income tax returns. Carsello's returns were obtained internally by IRS agents, who then interviewed about six to eight persons whose names they had gleaned from the seized records. One of the persons interviewed was Joe Francone,[1] an employee of Grand Sanitation and Supply who had asked for but been denied a loan by Carsello. Fran-

cone, however, did provide the interviewing agent with the names of 35 Grand Sanitation customers. One of those customers was the Brighton Construction Company, which was at the time itself the subject of a separate IRS investigation. The investigating agent then reviewed Brighton's cancelled checks, which were already in the possession of the IRS, and learned that Carsello had cashed checks from Brighton at two Chicago currency exchanges. The agent then visited the exchanges and obtained additional names of Grand Sanitation customers by reviewing checks cashed by Carsello at one of the exchanges. Now having a list of about 70 Grand Sanitation customers, the agent obtained all cancelled checks and invoices relating to their transactions with Grand Sanitation. These cancelled checks and invoices, obtained from Grand Sanitation customers, were instrumental in proving the defendant's failure to report gross business receipts, and it is the district court's refusal to suppress these records that Carsello contests here.[2]

## II.

On appeal, Carsello argues that the cancelled checks and invoices received into evidence were the suppressible "fruit of the poisonous tree" because (1) the criminal tax fraud investigation leading to the defendant's arrest and conviction would not have been initiated but for the disclosure of the usury records illegally seized from him, and (2) because the Government actually made use of the information obtained from the illegally seized usury records in the course of its investigation. Accordingly, Carsello reasons that the evidence admitted at trial was "come at by exploitation" of the illegal seizure of the usury records. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

---

1. Francone's name did not itself appear in the seized records, which listed him only as "Joe F." along with an address and telephone number. The address was incorrect, and the telephone number was no longer in service. However, the investigating agent learned that the outdated telephone number was listed under

the name "Francone," and the agent was able to obtain a current address for Joe Francone by reviewing IRS records.

2. The Government does not challenge on appeal the district court's suppression of Carsello's usury records.

The Government responds (1) that the causal connection between the evidence actually admitted at trial and the illegally seized usury records was so attenuated as to purge the former of any taint touching the latter, and (2) that the cancelled checks and invoices would inevitably have been discovered even if the Government had never made any use of the information gleaned from the usury records. Accordingly, the Government argues the evidence is admissible under both *Wong Sun* and *United States ex rel. Owens v. Twomey*, 508 F.2d 858, 865–66 (7th Cir. 1974).

### III.

Inasmuch as the Government stipulated at trial that its criminal tax fraud investigation of the defendant resulted from and was an outgrowth of the disclosure of the illegally seized usury records, there can be no doubt that some sort of a causal nexus exists between the evidence produced by the investigation and the illegal seizure of Carsello's usury records by the Chicago police. However, it seems clear to us, if not the defendant, that the mere fact that the investigation would not have been undertaken but for the disclosure of the usury records does not necessarily compel the conclusion that all the evidence discovered in the course of the investigation is therefore suppressible as "fruit of the poisonous tree." As the Supreme Court has most recently made clear,

> "Even in situations in which the exclusionary rule is plainly applicable, we have declined to adopt a 'per se or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness, which somehow came to light through a chain of causation that began with [illegal police action.]" *United States v. Ceccolini*, 435 U.S. 268, 276, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978).

Thus, the question before us is not whether the evidence admitted against Carsello at trial would not have come to light but for the illegal action of the police, but rather

> "whether, granting the establishment of the primary illegality, the evidence . . .

has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

This question, in turn, cannot be answered on the basis of "causation in the logical sense alone," but necessarily involves a weighing of the social costs of applying the exclusionary rule against the benefits to be gained therefrom, for the "penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." *United States v. Ceccolini, supra* at 1059, 1061–62; accord, *United States v. Calandra*, 414 U.S. 338, 349–354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. Paepke*, 550 F.2d 385, 388 (7th Cir. 1977). As Mr. Justice Powell explained in *Brown v. Illinois*, 422 U.S. 590, 609, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (concurring opinion),

> "the notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action becomes so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost."

Thus, bearing in mind that the primary, if not exclusive, purpose of the exclusionary rule is to deter future police misconduct, *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), we turn to the question whether the evidence admitted against Carsello at trial was come at by exploitation of the illegal seizure of his usury records or rather by means sufficiently unrelated as to purge the evidence of any taint resulting from the illegal police action.

### IV.

In support of his "fruit of the poisonous tree" argument, Carsello relies principally on the fact that the IRS agents used information gleaned from his usury records in the course of their tax fraud investigation. This, says Carsello, necessarily constitutes deliberate "exploitation" of the pri-

mary illegality and requires suppression of the cancelled checks and invoices admitted against him at trial because they were obtained through a chain of causation leading back to information revealed by the usury records.

We must agree with Carsello, of course, that in some sense of the word the Government did "exploit" the illegal action of the Chicago police by photocopying the usury records and using them as a source of leads during its tax fraud investigation. We cannot agree, however, that this "exploitation" led directly to any of the evidence actually used against the defendant at trial. After all, the usury records themselves were suppressed at trial, and none of the information appearing therein was related in any way to the activities of Grand Sanitation and Supply, Carsello's legitimate business enterprise. Indeed, the only link between the evidence admitted at trial and the usury records was a notation of "Joe F." along with an accompanying address and telephone number both of which were out of date. Because of the investigating agent's initiative and ingenuity, he was able to discover Joe Francone's current address from sources independent of the usury records and to interview him as a potential source of information concerning Carsello's lending activities. Much to the agent's chagrin, no doubt, Francone was unable to supply any information relevant to the agent's investigation of Carsello's failure to report interest income for, although Francone had asked for a loan, Carsello had not given him one. In the course of the otherwise unproductive interview, however, Francone revealed that he worked for Carsello at Grand Sanitation and Supply. The agent, who knew from IRS records that Grand Sanitation was owned by Carsello, then asked Francone to supply him with the names of some of Grand Sanitation's customers. Francone freely volunteered about 35 names. By chance, one of those customers happened to be the Brighton Construc-

tion Company, which was itself the subject of an unrelated IRS investigation at that time. From Brighton's cancelled checks, which were then in the hands of the IRS, the agent learned that Carsello had cashed checks made out to Grand Sanitation at two Chicago currency exchanges. With the cooperation of one of the currency exchange operators, the agent was able to obtain a list of about 35 more Grand Sanitation customers. Armed with the customer list, the agent then obtained the cancelled checks and invoices admitted against Carsello at trial from the customers themselves.

■ Given the rather tenuous link between the usury records and the evidence admitted at trial, we must agree with the district court's view that the discovery of the cancelled checks and invoices was sufficiently attenuated as to purge them of any taint associated with the illegal seizure of the usury records. There is simply no way that the Chicago police officers who seized Carsello's usury records or the federal agents who photocopied them could have foreseen that they would prove useful in the course of a tax fraud investigation begun six months later into Carsello's legitimate business enterprise, as opposed to his usury activities. Moreover, we find significant as did the Court in *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), that the evidence admitted at trial resulted from the voluntary disclosure of Grand Sanitation customers by Francone and the currency exchange operator, as well as the willing testimony of the customers themselves, which laid the proper foundation for admission of the cancelled checks and invoices into evidence. Like the testimony of the witness in *Ceccolini,* the voluntary cooperation and testimony of these parties could not have been anticipated at the time of the illegal seizure of Carsello's usury records and tends to dissipate the taint created thereby.[3]

---

**3.** Carsello seeks to distinguish *Ceccolini* on the ground that it involved the exclusion of a witness's testimony, as opposed to the suppression of physical evidence at issue here. We

recognize, of course, that *Ceccolini* is not *controlling* here, and that attenuation analysis may properly focus on different factors when the alleged "fruit of the poisonous tree" is the

In sum, we believe that the causal link between Carsello's usury records and the evidence admitted at trial was tenuous at best and sufficiently attenuated by intervening circumstances, including the voluntary cooperation of Francone, the currency exchange operator and Grand Sanitation customers themselves, as to permit the use of the cancelled checks and invoices at trial. Particularly when account is taken of the fact that the seizure of Carsello's usury records, though eventually ruled improper, was undertaken in good faith and pursuant to a warrant,[4] we fail to see how the deterrent purpose of the exclusionary rule would be materially served by its further application in the circumstances of this case. We believe that the suppression of the usury records themselves in both the state prosecution and the case at bar substantially effectuated the prophylactic purpose of the exclusionary rule, and that any additional deterrent value resulting from the further suppression of the cancelled checks and invoices at issue now would be de minimis and far outweighed, in our view, by the adverse impact on the administration of justice and our self-reporting system of taxation that would be occasioned by further extension of the exclusionary rule in the circumstances of this case. Accord, *United States v. Paepke,* 550 F.2d 385, 391 (7th Cir. 1977).

Accordingly, as we hold that the cancelled checks and invoices admitted against Carsello at trial were not suppressible as "fruit of the poisonous tree," we need not address the Government's alternative argument that the evidence was admissible under the "inevitable discovery" rule of *United States ex rel. Owens v. Twomey,* 508 F.2d 858, 865–66 (7th Cir. 1974).

The district court's judgment is

AFFIRMED.

---

testimony of a witness, as opposed to physical evidence. This is not to say, however, that the Court's reasoning in *Ceccolini* is totally inapposite in the circumstances of this case, where the physical evidence Carsello seeks to suppress was discovered as a result of information *voluntarily* supplied by a *third-party* to the investigation whose cooperation was not extracted by any police misconduct. Compare *Wong Sun v. United States,* 371 U.S. 471, 487–88 491–92, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). To paraphrase *Ceccolini,* the degree of free will exercised by the informant is not irrelevant in determining whether the basic purpose of the exclusionary rule will be advanced by the suppression of the physical evidence ultimately obtained as a result of the informant's voluntary cooperation with the authorities. See 98 S.Ct. at 1060–61. At the very least the independent act of volition of the informant is a relevant "intervening circumstance" to be taken into account in the course of our attenuation analysis. Cf. *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

4. As the district court observed in the course of its ruling on Carsello's motion to suppress, the Fourth Amendment violation involved here was not a flagrant one and resulted from a good faith error concerning the scope of a search authorized under cover of a warrant. The lack of flagrancy of the police misconduct and the good faith in which it was undertaken do, of course, bear directly on the degree of attenuation necessary to dissipate the taint resulting therefrom. *Brown v. Illinois,* 422 U.S. 590, 603–04, 609–12, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).