DANIEL S. PEARSON, Judge.
The trial court, because of a “totality of circumstances,” granted Matera’s Rule 3.850 motion and vacated his thirteen-year-old robbery conviction. We have examined the record before the trial court and find no circumstances which would warrant a finding that Matera’s conviction was obtained in violation of the Constitution or laws of the United States or the State of Florida. We therefore reverse with directions that Matera’s conviction be reinstated.
Matera’s motion for relief was based on four grounds. He complained that (1) several phone calls he made from a public telephone booth at the Dade County Jail in April 1966, shortly after his arrest and a year before his trial, were illegally intercepted; (2) his conversations in a New York club before the robbery were bugged; (3) he was identified at trial because of a preceding suggestive show-up of which he was not aware; and (4) he was deprived by State conduct of the testimony of a witness who would have impeached a key State witness, Braverman.
We devote only so much space and time[1] as is required to demonstrate that Matera’s claim for relief, facially impressive, is more sound and fury than substance.
At Matera’s trial the simple issue was the identification of Matera as one of the participants in the morning holdup of the' Harbor Island Spa in Miami. Matera was identified by a single witness, one Jesse Lee Lamons, a driver for a Miami laundry. La-mons testified that he went to the Spa to deliver laundry. As he unloaded the laundry, he observed a man, whom he later identified as John Matera, standing just inside the door of the hotel. Matera then walked out onto the porch, and Lamons said “good morning” to him. Lamons brought three blankets inside the door and returned to his truck for more. As he came back with a second set of blankets, Matera grabbed him by his arm and told Lamons that he wanted to show him something. When Lamons resisted him, Matera shoved Lamons. When Lamons shoved back, another' person, a big man wearing a mask, came up with a gun. Matera and the other man subdued Lamons and took him into a bathroom in the hotel, where he was handcuffed and locked up with a Mr. Appleton. During this period, Lamons saw Matera come to the door of the bathroom twice.
Lamons testified that on April 1, 1966, the morning following the robbery, he identified Matera in a live line-up at Public Safety Department Headquarters. Photographs depicting the line-up were admitted into evidence. Lamons identified the man he selected as the number four man in the photos, John Matera.
Lamons testified that about a month after the robbery, in May 1966, he and another witness, Yerby, went to New York. While in New York, Lamons, Yerby, and a third man, Bruce Braverman, spent some time at the office of the New York District Attorney looking at pictures. Lamons stated that he did not have a chance to identify anyone in the courtroom in New York. Matera’s counsel extensively cross-examined Lamons in an effort to impeach the reliability of his identification of Matera.
I.

The Dade County Phone Tap.

A State investigator recorded three telephone calls made by Matera from *1364 the jail after his arrest. One was to a telephone information operator; one to a person assumed to be a member of Matera’s family; and one to the office of the lawyer who represented Matera immediately after arrest, but not at trial. The conversation with an unidentified party at the lawyer’s office lasted about forty to ninety seconds and consisted of Matera inquiring about obtaining a bondsman. No overheard conversations were introduced at Matera’s trial, and no evidence, as must be obvious, was shown to be derived therefrom. Indeed, the prosecutors for the State testified that when Matera was tried, they were unaware that a tap had occurred. Thus, even if, arguendo, Matera’s Fourth[2] or Sixth[3] Amendment rights were violated by the tap in question, the violation produced nothing that affected Matera’s trial.
II.

The New York Surveillance.

In early 1966, before the robbery, electronic surveillance was in effect on the phones and premises of the Embe Club in New York. Matera was overheard saying that he was going to Florida with another person and later overheard, on the phone, saying that he was in Florida. Neither of these conversations was introduced in Mat-era’s trial. When Michael Metzger, an Assistant District Attorney in New York instrumental in and familiar with the Embe surveillance, read about the Harbor Island Spa robbery, he called the Dade County Sheriff’s Office to find out if they had Matera’s picture. When they said they did not, he sent them a picture, which Matera argues was used by the police to help them identify and arrest Matera.
Presumably, it is Matera’s position that were it not for the Embe Club electronic surveillance, Metzger would not have sent the police Matera’s picture; were it not for the police having his picture, Matera would not have been arrested; and, of course, if Matera had never been arrested, he would never have been identified by Lamons in a line-up and at trial and never have been convicted.
Matera makes no claim, and has never made any claim, that his arrest was unlawful as being not supported by probable cause. He makes no claim, and indeed the evidence is to the contrary, that his picture forwarded by Metzger to Dade County was the product of a former illegal arrest. He makes no claim that Lamons ever saw or identified him from the picture. He makes no effort to show that the picture was ever used by the police. He baldly asserts that his conviction is somehow tainted by the Embe Club electronic surveillance which led to the forwarding of the picture.
*1365 While it is doubtful that this record demonstrates the slightest causal connection between the electronic surveillance and the evidence leading to Matera’s conviction, if it could arguably be said that one exists, it is so clearly attenuated as to dissipate any possible illegality.[4] United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); United States v. Ceccolini, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Shayne v. State, 384 So.2d 711 (Fla. 3d DCA 1980); State v. Maier, 378 So.2d 1288 (Fla. 3d DCA 1980). Accordingly, this claim by Matera cannot be a basis for relief.[5]
III.

Suggestive Identification.

The record affirmatively and abundantly shows that Matera’s trial counsel knew before trial that Lamons and other witnesses had gone to New York together and that they were shown photos of the defendants.[6] The decision of Matera’s trial counsel not to attack Lamons’ identification of Matera on the theory that Lamons’ viewing of Matera’s picture in New York affected the in-trial identification (understandable in light of the fact that months before he went to New York, and on the heels of the crime, Lamons had picked Matera out of a line-up that itself was never attacked as suggestive) precludes Matera from having such an issue, available to have been litigated at trial, considered on a Rule 3.850 motion thirteen years later. Carillo v. State, 382 So.2d 429 (Fla. 3d DCA 1980); State v. Gomez, 363 So.2d 624 (Fla. 3d DCA 1978); Hughes v. State, 354 So.2d 130 (Fla. 3d DCA 1978); Clements v. State, 320 So.2d 44 (Fla. 3d DCA 1975).
Moreover, as the earlier factual recitation of the crime reveals, even if there had been a suggestive show-up of Matera in New York observed by Lamons some months after Lamons’ unchallenged earlier identification of Matera, there is not, under the totality of the circumstances, Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), any substantial likelihood that the New York show-up led to Lamons misidentifying Matera, see Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Baxter v. State, 355 So.2d 1234 (Fla. 2d DCA 1978); Bittner v. State, 330 So.2d 855 (Fla. 3d DCA 1976); Johnson v. Wainwright, 523 F.2d 1253 (5th Cir. 1975); United States v. Rodriguez, 510 F.2d 1 (5th Cir. 1975). Indeed, Lamons’ identification of Matera in a nonsuggestive *1366 line-up within hours of the robbery obviates the necessity of considering the constitutionality of a suggestive show-up in New York months later if, arguendo, one had occurred, Johnson v. Wainwright, supra; United States v. Rodriguez, supra.
IV.

The State’s Suppression of A Witness To Impeach Braverman.

Matera contended that the State prosecutors suppressed material evidence favorable to Matera in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when they told Michael Metzger, a New York District Attorney (who could impeach Braverman, a State witness, by testimony that Braverman lied and admitted lying), to go back to New York. It is enough to say [7] that this claim was disposed of earlier by the Supreme Court of Florida, which held in State v. Matera, 266 So.2d 661, 665 (Fla.1972):
“Braverman was so extensively impeached by both the prosecution and the defense, covering hundreds of pages of transcript, that little, if anything, remained of his credibility. But even if the jury chose to rely on his testimony that one of the defendants said in March of 1966 that he was going to Miami to make a ‘score’[8] and infer therefrom that the Harbor Island Spa robbery was the intended ‘score’, the evidence is of little significance in the case. ...”
See also Galtieri v. Wainwright, 582 F.2d 348, 362-64 (5th Cir. 1978). This holding is quite clearly the law of the case and is dispositive of Matera’s claim. There simply is no reasonable likelihood that further impeachment of Braverman could have altered the jury’s verdict.
We close this latest chapter of Matera’s quest for relief from his valid conviction. Whatever else Matera may have shown, he has shown no cognizable damage to himself and, accordingly, is not entitled to have his conviction vacated.
Reversed and remanded with directions to reinstate Matera’s conviction.

. For those who are interested in Matera’s pri- or efforts to be relieved from his conviction, we refer them to Matera v. State, 218 So.2d 180 (Fla. 3d DCA 1969); Matera v. State, 254 So.2d 843 (Fla. 3d DCA 1971); State v. Matera, 266 So.2d 661 (Fla. 1972); State ex rel. Matera v. Wainwright, 277 So.2d 611 (Fla. 3d DCA 1973); Matera v. Florida, No. 73-2-Civ-JE (S.D.Fla. March 8, 1973); Galtieri v. Wainwright, 545 F.2d 942 (5th Cir. 1977); Galtieri v. Wainwright, 582 F.2d 348 (5th Cir. 1978) (en banc); State v. Matera, 378 So.2d 1283 (Fla. 3d DCA 1980).

. A tap of a public phone booth in 1966 was not violative of the Fourth Amendment, which at that time was held to exclude wiretap evidence only where there was “an actual physical invasion of the defendant’s house ‘or curtilage’ for the purpose of making a seizure.” Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). In 1967, the Supreme Court, in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), shifted the emphasis to the privacy expectations of the individual whose conversation is seized, but Katz’s applicability was later held to be limited to electronic surveillance conducted after December 18, 1967. Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969). As previously stated, the tap in Matera’s case occurred in 1966.
Moreover, as to Matera’s conversations with other than his counsel’s office, Matera, as a prisoner in jail, even post-Katz, had no protect-able expectation of privacy. Lanza v. New York, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962); Brown v. State, 349 So.2d 1196 (Fla. 4th DCA 1977); Williams v. Nelson, 457 F.2d 376 (9th Cir. 1972); United States v. Hearst, 412 F.Supp. 888 (N.D.Cal.1976); North v. Superior Court of Riverside County, 8 Cal.3d 301, 104 Cal.Rptr. 833, 502 P.2d 1305 (1972).

. A governmental intrusion into the attorney-client relationship, while not condoned, is not ipso facto a violation of the Sixth Amendment right to counsel. Absent proof that the substance of the overhead conversation was of benefit to the prosecutor, the constitutional right is not impinged. Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); United States v. Sander, 615 F.2d 215 (5th Cir. 1980); United States v. Irwin, 612 F.2d 1182 (9th Cir. 1980); United States v. Franklin, 598 F.2d 954 (5th Cir. 1979); Mastrian v. McManus, 554 F.2d 813 (8th Cir. 1977); United States v. Meinster, 478 F.Supp. 1131 (S.D.Fla.1979).

.Once again, as in the tap of the phone booth, see n. 2, supra, the 1966 electronic surveillance of the Embe Club was not violative of Matera’s Fourth Amendment rights. At the time the surveillance was in effect, it was valid under New York law. Evidence validly procured under the laws of a sister state is admissible in Florida provided only that the issuance and execution of the warrant is not constitutionally infirm. See McClellan v. State, 359 So.2d 869 (Fla. 1st DCA 1978). It was not until June 12, 1967 (a year after the electronic surveillance of the Embe Club and months after Matera’s trial), that the New York electronic surveillance statute was struck down in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and not until later in 1967 that Olmstead v. United States, supra, and Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), were overturned in Katz v. United States, supra. See n. 2, supra. Katz was held prospective only in Desist v. United States, n. 2, supra, and Berger held prospective only in Kaiser v. New York, 394 U.S. 280, 89 S.Ct. 1044, 22 L.Ed.2d 274 (1969). Thus, given that Matera had no proprietary interest in the Embe Club, but was a mere customer, under the law applicable in 1966 (the then valid New York statute, Olmstead and Goldman), no Fourth Amendment right of Matera was offended.

. Even if Matera’s arrest were illegal, Lamons’ trial testimony and in-court identification of Matera would clearly be admissible. United States v. Crews, supra; State v. Maier, supra; United States v. Brookins, 614 F.2d 1037 (5th Cir. 1980); United States ex rel. Moore v. Lane, 612 F.2d 1046 (7th Cir. 1980); United States v. Carsello, 578 F.2d 199 (7th Cir. 1978); Parker v. Estelle, 498 F.2d 625 (5th Cir. 1974); Gissendanner v. Wainwright, 482 F.2d 1293 (5th Cir. 1973); United States v. Balistrieri, 403 F.2d 472 (7th Cir. 1968), vacated and remanded on other grounds, 395 U.S. 710, 89 S.Ct. 2032, 23 L.Ed.2d 654 (1969).

. Matera presented evidence of a suggestive show-up, not of himself, but of Galtieri, his co-defendant.

. We add, however, that the defense was aware of Metzger’s ability to impeach Braverman; aware that Metzger was returning to New York; indicated that if they wanted to call Metzger as a witness, they would subpoena him. Additionally, this ground for relief was abandoned below and specifically not considered by the trial court.

. Braverman’s testimony as it related to Mat-era is even less significant, since Braverman testified that it was Galtieri who made this statement to him.