UNITED STATES of America

v.

HOANG ANH THI DUONG, Tu Anh Phan, and Danh Anh Phan, Defendants.

No. CR. 01–126–A.

United States District Court, E.D. Virginia, Alexandria Division.

July 24, 2001.

Bruce E. Morton, William J. Lovett, U.S. Dept. of Justice, Washington, DC, for plaintiff.

John Kenneth Zwerling, Lisa Bondareff Kemler, Zwerling & Kemler, P.C., Alexandria, VA, Bernard S. Bailor, Washington, DC, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this prosecution for conspiracy and tax fraud, defendants seek to suppress the evidence seized in two searches: (i) a 1995 Federal Bureau of Investigation ("FBI") search conducted at defendants' home in connection with an unrelated criminal investigation, and (ii) a 1997 search conducted by the Internal Revenue Service ("IRS") in connection with the investigation that led to this prosecution. Plaintiffs contend that evidence seized in the 1995 FBI search and seizure should be suppressed, *inter alia*, on the ground that the scope of the search and the materials seized were beyond the scope of the warrant. Defendants further contend that all evidence from the 1997 IRS search and seizure constitute "fruit of the poisonous tree" and thus should be suppressed, as that search stems from and is tainted by the 1995 FBI search.[1]

Following hearings[2] at which evidence was taken and arguments heard, the Court

---

1. *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

2. The Court held five hearings on defendants' suppression motion: on June 19 and 22, 2001 and July 2, 11, and 13, 2001.

granted in part and denied in part defendants' motion to suppress. *See United States v. Duong,* Crim. No. 01–126–A (E.D.Va. July 13, 2001) (Order). Defendants thereafter filed a motion for reconsideration. This Memorandum Opinion sets forth the reasons for the initial ruling and for the denial of the motion for reconsideration.

## I.[3]

Defendant Hoang Anh Thi Duong and her daughters, defendants Tu Anh Phan and Danh Anh Phan, are alleged to have been officers of Phuoc–Lai, Inc. ("Phuoc–Lai") or otherwise responsible for its gross receipts. Phuoc–Lai is a Virginia corporation doing business as Café Dalat, a Vietnamese restaurant in Arlington, Virginia. All defendants are charged in the first count of the six-count indictment with participation in a conspiracy to under-report the gross receipts of Phuoc–Lai on federal corporate income tax returns for the years 1991 through 1995, in violation of 18 U.S.C. § 371 and 26 U.S.C. § 7206(1). In the remaining five counts only defendant Tu

Anh Phan is charged with filing false federal corporate income tax returns for each of the five years involved, in violation of 26 U.S.C. § 7206(1). The 1991 and 1992 tax returns were filed on April 17, 1995; the 1993 return on September 8, 1995; the 1994 return on November 6, 1995; and the 1995 return on October 1, 1996.

On January 6, 1994, FBI agents investigating the unrelated criminal activities of Tai Anh Phan[4] conducted a "trash cover" at 3309 Potterton Drive, Falls Church, Virginia, the residence of Tai Anh Phan and defendants. According to FBI Special Agent Charles Knowles, the agent assigned to the Tai Anh Phan investigation, he and another agent went to the Phan residence at around 4:30 a.m. and seized several bags of trash left on the sidewalk for collection. Examining the seized items later, Agent Knowles found numerous documents, including Phuoc–Lai bank records, Café Dalat credit card statements and meal tax reports, and individual envelopes containing daily Café Dalat guest checks for 1991, 1992, and 1993.[5] After concluding

---

**3.** The facts recited here are the Court's essential findings pursuant to Rule 12(e), Fed. R.Crim.P. These facts are derived from the record as a whole, including the testimonial and documentary evidence presented by the parties in the course of the several hearings held on defendants' motion to suppress. In this regard, the government presented the testimony of FBI Special Agent Charles Knowles and IRS Special Agent Denise Rocawich, as well as a number of documents and photographs. Defendants also added various documents and photographs to the record and presented testimony from each of the defendants.

**4.** Tai Phan is the son of defendant Hoang Anh Thi Duong and the brother of defendants Tu Anh Phan and Danh Anh Phan. At the time, the FBI was investigating Tai Anh Phan's involvement in, *inter alia,* drug trafficking, credit card fraud, and extortion.

**5.** The government identifies the daily Café Dalat guest checks and the following documents as having been obtained through the 1994 trash cover and as evidence it intends to use at trial for its case-in-chief:

    (1) Phuoc–Lai First Union bank account statements for June 1991 through December 1991 and January 1992 through February 1992;

    (2) Café Dalat credit card statements for September 1991 and December 1991;

    (3) meal tax reports and envelopes for January 1993 through February 1993;

    (4) Nabanco contract with Café Dalat;

    (5) First American Bank account statement for January 1991;

    (6) meal tax reports and envelopes for December 1991 and January 1992;

    (7) meal tickets in envelope dated September 23, 1990;

    (8) documents re: CIGNA workmen's compensation;

at the time that these items were of no use in the Tai Anh Phan investigation, Agent Knowles placed the items in two boxes for storage in the evidence control room at the FBI field office.[6]

Eighteen months later, on June 30, 1995, the FBI arrested Tai Anh Phan and three co-conspirators unrelated to the Phan family at the culmination of a month-long investigation into the planned robbery of a federally licensed gun dealer in suburban Maryland. Later that night and through the following morning, FBI agents searched the Phan residence ("1995 FBI search") pursuant to a warrant issued by a magistrate judge. The affidavit filed in support of the warrant application stated that the FBI learned through a confidential informant that Tai Anh Phan and others were planning to rob the Maryland gun dealer. Except for a statement relating that the confidential informant observed defendant Hoang Anh Thi Duong counting money at the residence, however, there were no other statements in the affidavit suggesting that any other member of the Phan family was involved in the robbery conspiracy. Indeed, the affidavit did not even disclose that other members of the

Phan family in addition to Tai Anh Phan and his mother lived at the Potterton Drive residence.

Based on this affidavit, the magistrate judge issued a warrant that referred to, and to which was attached, a document entitled "Attachment A" listing categories of items authorized to be seized. Attachment A is apparently a standard drug search warrant attachment, not one specifically tailored to a robbery conspiracy. Recognizing this, the magistrate judge deleted from the attachment a paragraph that authorized seizure of "books, records, receipts, notes, ledgers and other papers, including any computerized or electronic records, relating to the transportation, ordering, purchase and distribution of controlled substances." But significantly, the magistrate judge left untouched the remaining categories listed in the attachment, including paragraph c, which authorized seizure of "books, records, receipts, bank statements, and records, money drafts, letters of credit, money order and cashiers checks, receipts, pass books, bank checks and any other items evidencing the

(9) letter regarding Journal Newspaper;
(10) First American Bank credit card statement for November 1991; and
(11) letter to CIGNA dated 3/6/91.

**6.** Defendants dispute whether the FBI in fact conducted a trash cover. Specifically, they note (i) that Agent Knowles's affidavit does not mention a trash cover, (ii) that another affidavit he submitted in support of a petition for a wiretap authorization does not mention a trash cover, (iii) that defendants have testified that they never threw out Café Dalat records on January 6, 1994, and (iv) that a file folder that the government designated as having been obtained through the 1994 trash cover contains documents that postdate the trash cover. The government, however, has established by a persuasive preponderance of the evidence that a trash cover occurred in January 1994, and that the Café Dalat daily guest receipts were obtained from the trash

cover. Agent Knowles testified credibly and convincingly that he and another agent performed the trash cover; that they found numerous documents, including "a lot of receipts, business receipts from Café Dalat" that were "packaged in individual envelopes," and that trash cover documents were kept separately from evidence seized during the 1995 FBI search. Moreover, the government has produced a chain-of-custody form indicating the receipt of trash cover documents for storage in an FBI evidence control room in January and June of 1994. The record further reflects that the 1994 trash cover documents remained in storage, segregated from other documents, until February 1997, when Agent Knowles delivered them to Agent Rocawich. In sum, Agent Knowles's testimony on the trash cover documents, as well as other material matters, was generally credible and persuasive.

obtaining, secreting, transfer, concealment and/or expenditure of money."

Neither the warrant itself, nor Attachment A, described the purpose for the search—namely, to seize evidence relating to a conspiracy to commit robbery in violation of 18 U.S.C. § 1951.[7] This information was conveyed to the agents conducting the search by way of Agent Knowles's affidavit, which was referenced in, and attached to, the warrant. Thus, the warrant stated that "the affidavit[ ] ... establish[es] probable cause to believe that the ... property so described is now concealed on the ... premises above described and establish[es] grounds for the issuance of this warrant." The affidavit, in turn, averred that "there is probable cause to charge TAI ANH PHAN ... with a violation of 18 U.S.C. § 1951 and 18 U.S.C. § 2 for ... conspiring to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by robbery," and that

> there is probable cause to believe that the residence located at 3309 Potterton Drive, Falls Church, Virginia. . contains evidence, instrumentalities and fruits of criminal activities and property used to commit criminal activities, including but not limited to those items set forth in Attachment A, herewith attached and made part of this affidavit.

The search pursuant to the FBI warrant began at around 11:30 p.m. on the night of June 30, 1995 and continued until approximately 3:00 a.m. in the early morning of July 1. The scope of the search was extensive, covering every room in the house, including the bedrooms of family members not mentioned in the warrant or affidavit and not involved or even suspected of involvement in the targeted robbery conspiracy. The expansive breadth of the FBI search is also reflected in the range and volume of documents seized. Thus, agents seized, *inter alia,* (i) documents relating to Café Dalat, including a file folder containing ledgers of Café Dalat sales from February 1994 through May 1995, and Phuoc–Lai bank account statements, insurance bills, and 1991–1995 deposit records; (ii) defendants' personal records, including school records, bank and other financial records, warranties, and receipts; (iii) personal tax returns of defendants Tu Anh Phan and Danh Anh Phan and of their sister, Anh Minh Phan; (iv) home videotapes; (v) records relating to rental property owned by Anh Minh Phan and defendant Tu Phan; and (vi) family life insurance records. Significantly, very few documents seized in the 1995 FBI search related to the targeted robbery conspiracy. When asked during the course of the suppression hearing whether the FBI in fact seized any documents that proved to be evidence of the robbery conspiracy, Agent Knowles identified only a note that Tai Anh Phan wrote to a co-conspirator, instructing him where to store the guns that they planned to steal. By contrast, many of the documents seized in the 1995 FBI search have been designated by the government under Rule 12(d)(2), Fed.R.Crim.P., as evidence it intends to use at trial for its case-in-chief. Specifically, these documents include (i) the February 1994 through May 1995 sales reports ledgers; (ii) 1994 and 1995 First Union bank account statements for Phuoc–Lai; (iii) Phuoc–Lai deposit records for 1991 through 1995; (iv) Hartford Insurance bills and notice; and (v) Café Dalat tip records for January 1994.

The arrest of Tai Anh Phan and his co-conspirators occurred on June 30, 1995,

---

**7.** Attachment A stated only that "[e]vidence of the commission of criminal offenses, and property that has been used to commit a criminal offense" were to be seized.

contemporaneously with the FBI search. Thereafter, in November 1995, Tai Anh Phan was convicted of conspiracy to commit robbery and of using a firearm in connection with a crime of violence. Agent Knowles testified during the suppression hearing that while he and the Assistant United States Attorney prosecuting Tai Anh Phan were reviewing documents from a file cabinet seized during the 1995 FBI search in preparation for the Tai Anh Phan trial, they found nothing relevant to the robbery conspiracy, but, as Agent Knowles put it, "it became obvious that there were some issues regarding taxes and so forth." Specifically, Agent Knowles testified that they reviewed documents from the 1995 FBI search indicating "some ownership of what looked like a lot of assets and property" that "on the surface appeared not to match up" with the information reported in defendants' personal tax returns.[8] In light of this, Agent Knowles contacted IRS Special Agent Michael Barberi in the Fall of 1996 and asked him to review the documents.[9] Agent Barberi thereafter referred Agent Knowles to Special Agent Denise Rocawich of the IRS.[10]

In or around February 1997, evidence from both the 1994 trash cover and the 1995 FBI search was transferred to Agent Rocawich.[11] Agent Rocawich thereafter (i) searched databases accessible to the IRS, from which she received copies of defen-

**8.** Defendants' tax returns were obtained during the course of the government's preparation for Tai Phan's trial pursuant to an order directing the IRS to disclose defendants' returns under 26 U.S.C. § 6103(i)(1). *See United States v. Tai Anh Phan*, Crim. No. 95–329–A (E.D.Va. Oct. 19, 1995) (Order for disclosure of returns and return information). The government, in its petition for the Order, stated its belief that the returns were "relevant to [Tai Anh Phan's] motive for the robbery and to a potential defense in the case of sufficient legitimate income from the family business to preclude a motive for robbery." It added, moreover, that it had "received information from a confidential informant that the family business in Arlington, Virginia is used by [Tai Anh Phan] to launder money obtained from the use of fraudulent credit cards and extortion."

**9.** The chain-of-custody form for the seized file cabinet does not show that Agent Barberi received the documents in the fall of 1996. Agent Knowles testified that, as the form indicates, he retrieved the documents for review on September 11, 1996, and that he subsequently turned over the documents to Agent Barberi while not in possession of the chain-of-custody form. Agent Knowles also testified that he never gave Agent Barberi documents from the 1994 trash cover.

**10.** The record unambiguously discloses that documents obtained in the 1994 trash cover did not play a role in Agent Knowles's decision to refer the matter to the IRS. In this regard, the chain-of-custody forms for the trash cover documents, unlike the forms for the 1995 FBI search documents, do not show that they were taken out for review in 1995, when Tai Anh Phan went to trial; rather, the trash cover custody forms show that the documents were put into storage in 1994 and were not taken out until 1997, when Agent Knowles turned them over to Agent Rocawich.

**11.** Agent Knowles testified that he remembered turning over the documents from the 1995 FBI search to Agent Barberi in the Fall of 1996, and turning over to Agent Rocawich in February 1997 only the 1994 trash cover documents. However, the chain-of-custody forms for both the 1995 FBI search documents and the 1994 trash cover documents show Agent Rocawich receiving *both* sets of documents on February 5, 1997. Also, Agent Rocawich testified that Agent Knowles gave her "some records that he had obtained from a search warrant, a prior search warrant the FBI had done," at their first meeting, and that she received documents both from the trash cover and the FBI search on the same day. This minor inconsistency is neither material nor significant, although the preponderance of the evidence and testimony indicates that Agent Knowles turned over both sets of documents to Agent Rocawich on February 5, 1997.

dants' individual income tax returns and Phuoc–Lai's corporate tax returns, (ii) issued grand jury subpoenas to several banks, and (iii) obtained information from public records on real estate and other property owned by defendants. Her investigation ultimately led to the search of defendants' home, Café Dalat, and defendants' safe deposit box at a First Union National Bank branch in Arlington, Virginia on April 25, 1997 ("1997 IRS search"). These searches were authorized by a warrant issued by a magistrate judge that was issued pursuant to an affidavit filed by Agent Rocawich. In this affidavit, Agent Rocawich stated that she began investigating the defendants when the IRS was provided access to (i) the records seized by the FBI in 1995, which included defendants' personal bank records and Café Dalat bank statements and sales receipts, and (ii) the records of Café Dalat daily sales receipts obtained in the 1994 trash cover. These documents, Agent Rocawich averred, showed that Phuoc–Lai underreported business income from Café Dalat by as much as 50% in 1992 and 1994. Specifically, she summarized the underreported income in her affidavit as follows:

| Year | Taxable Income | Gross Receipts per Tax Return | Sales Receipts per FBI Search/Trash Cover |
|---|---|---|---|
| 1992 | $0.00 | $278,253.00 | $574,019.75 |
| 1993 | $0.00 | $274,188.00 | unknown |
| 1994 | $0.00 | $254,448.00 | $519,741.79 |
| 1995 | ($13,421.00) | $331,037.00 | $254,448.00 |

Moreover, Agent Rocawich stated that her analysis of (i) defendants' bank statements, which disclosed large currency deposits; (ii) the Currency Banking Retrieval System, which indicated large cash transactions involving defendants' accounts; and (iii) publicly available and seized property records, which showed large purchases of real and personal property, revealed that defendants "are involved in an ongoing and continuing scheme to evade reporting to the Internal Revenue Service all income which they receive from [Café Dalat] in violation of Title 26 United States Code 7201."

Agent Rocawich's testimony during the course of the suppression hearing further clarified her use of the 1994 trash cover and 1995 FBI search documents in her investigation.[12] Thus, she testified that, in arriving at the sales receipts figure for 1992, she added up the 1992 daily guest receipts recovered from the 1994 trash cover, representing approximately 75% of the days in that year.[13] As for the sales receipts figures for 1994 and 1995, however, she added up the sales reports ledgers for February 1994 through May 1995 that were seized during the 1995 FBI search.[14] In this regard, the 1994 and 1995 sales receipts figures represented approximately 11 months and 5 months of sales, respectively, for those years. And, Agent Rocawich admitted that for each of the in-

**12.** Agent Rocawich's testimony on these as well as other material matters was generally credible and persuasive.

**13.** Agent Rocawich testified that there were also receipts from various dates in 1991 and 1993, but that there were not enough dates represented to allow her to arrive at a total annual figure. She did not attempt to predict statistically the annual receipts for either year.

**14.** Copies of these sales reports ledgers were returned to defendants in 1995 but were subsequently re-seized during the 1997 IRS search.

vestigative steps she took, she originally obtained a lead from documents seized by the FBI in 1995. Thus, it is clear that the critical items of evidence in Agent Rocawich's investigation were (i) the 1992 Café Dalat guest receipts obtained from the 1994 trash cover and (ii) the 1994 and 1995 Café Dalat sales reports ledgers seized during the 1995 FBI search. These two sets of documents provided the clearest evidence to Agent Rocawich that Café Dalat's gross receipts were under-reported in corporate income tax returns for 1992, 1994, and 1995.

## II.

### A. The 1995 FBI Search

The analysis of defendants' motion to suppress evidence seized during the 1995 FBI search requires, first, a determination whether the FBI search warrant was valid under the Fourth Amendment, and, if so, second, whether the scope of the search exceeded that authorized by the warrant.

The Fourth Amendment declares that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment's requirement that warrants "particularly describ[e] the place to be searched, and the persons of things to be seized," prohibits general warrants authorizing the indiscriminate, "wide-ranging exploratory search" of a person's personal effects for evidence of any crime. *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) ("The manifest purpose of this particularity requirement was to prevent general searches."); *United States v. Oloyede*, 982 F.2d 133, 138 (4th Cir.1992). In this regard, "the warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the

magistrate has authorized him to seize," *United States v. George*, 975 F.2d 72, 75 (2d Cir.1992), and thus "prevent[ ] the seizure of one thing under a warrant describing another," *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927). These well-settled principles, applied here, compel the conclusion that the FBI search warrant was valid.

█ It is true, as defendants point out, that the language used in the search warrant and Attachment A listing the items to be seized was, by itself, excessively broad under the Fourth Amendment. Neither form identified the crime for evidence of the commission of which the agents were supposed to search defendants' residence; rather, Attachment A merely provided for the seizure of "[e]vidence of the commission of criminal offenses, and property that has been used to commit a criminal offense." This omission, coupled with the broad authorization of Attachment A to seize any evidence of unspecified criminal offenses, "provides no readily ascertainable guidelines for the executing officers as to what items to seize." *George*, 975 F.2d at 76. Because an "authorization to search for 'evidence of *a* crime,' that is to say, any crime, is so broad as to constitute a general warrant," these two forms, standing alone, do not satisfy the particularity requirement. *Id.* Yet, this defect is not fatal, for where, as here, the warrant incorporates by reference a supporting affidavit that is attached thereto, the affidavit "may provide the necessary particularity for a warrant." *United States v. Washington*, 852 F.2d 803, 805 (4th Cir.1988). In this regard, Agent Knowles's affidavit, which was attached to the FBI search warrant, clearly limited the 1995 FBI search to evidence of "a violation of 18 U.S.C. § 1951 and 18 U.S.C. § 2 for ... conspir[acy] to obstruct, delay, and affect commerce and the

movement of articles and commodities in commerce by robbery." And, because there is no question that Agent Knowles's affidavit provides probable cause for a search so limited, the FBI search warrant was not a general search warrant and meets the Fourth Amendment's particularity requirement.

■■■ Given this conclusion, the next step in the suppression analysis is to consider whether the scope of the actual search exceeded the scope justified by the probable cause contained in Agent Knowles's affidavit. This follows from the well-settled principle that "the scope of a lawful search is 'defined by the object of the search and the places in which there is probable cause to believe that it may be found.'" *Garrison*, 480 U.S. at 84–85, 107 S.Ct. 1013 (quoting *United States v. Ross*, 456 U.S. 798, 824, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). And this, in turn, is so because "[t]he Fourth Amendment prohibits general warrants *and* general searches," *United States v. Fawole*, 785 F.2d 1141, 1144 (4th Cir.1986) (emphasis added), and the requirement of sufficient particularity in the warrant as to items to be seized would be rendered nugatory were officers allowed to disregard the limits imposed by the probable cause supporting the warrant and instead conduct a "fishing expedition[,]"[15] or a "general, exploratory rummaging in a person's belongings once the police have gained access to the home."[16] Here, the permissible scope of a search conducted pursuant to the FBI search warrant was clearly limited to evidence relating to Tai Anh Phan's participation in a robbery conspiracy, for Agent Knowles's affidavit provided probable cause as to that crime and to no other. And significantly, this conspiracy was ap-

parently rather short-lived, extending only over the two-to-three-month period prior to the June 30–July 1 search. Yet, despite the relatively narrow scope of the probable cause supporting the search, FBI agents searched and seized thousands of documents drawn from every room in the house, including receipts for furniture purchases from as early as 1987, personal medical history forms from 1990, mammogram test results from 1994, cable television bills from 1991, and hundreds of other documents belonging or relating to defendants or Café Dalat. The FBI's search and seizure of these documents, as well as the documents the government intends to use in its case-in-chief against defendants—namely, (i) the sales reports ledgers for February 1994 through May 1995; (ii) First Union bank account statements for Phuoc–Lai for 1994 and 1995; (iii) Phuoc–Lai deposit records for 1991 through 1995; (iv) Hartford Insurance bills and notice; and (v) Café Dalat tip records for January 1994—was manifestly beyond the scope of the warrant. For all of these documents, the requisite "nexus ... between the item to be seized and criminal behavior" simply did not exist. *Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Nor can the government take refuge in the broad language of paragraph c of Attachment A, for where, as here, the language in a warrant "authorized a broader search than was reasonable given the facts in the affidavit supporting the warrant," seized evidence arguably falling within broad language but unrelated to facts stated in the affidavit must be suppressed. *See United States v. Ford*, 184 F.3d 566, 576–77 (6th Cir.1999). Accordingly, the evidence from the 1995 FBI search must be suppressed.

**15.** *United States v. Shilling*, 826 F.2d 1365, 1369–70 (4th Cir.1987).

**16.** *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *see also Oloyede*, 982 F.2d at 138.

■ Seeking to avoid this result, the government argues, unpersuasively, that the documents seized were reasonably related to the crime described in the affidavit. In this regard, Agent Knowles testified that he believed these documents were reasonably related to the probable cause underlying the FBI search warrant because: (i) financial and travel documents would have aided in "put[ting] dates on Phan's movement during that period and the period before that, . . . show[ing] meetings, any kind of payments to some of the co-conspirators that he may have made up front;" (ii) financial documents could show payments Tai Anh Phan may have made to coconspirators, which "could be as simple as just a check written in a checking account," or "disguised as a payment to a vendor from a business account"; (iii) Tai Anh Phan held meetings with cooperating witnesses at, made calls from, and was arrested at, Café Dalat, and documents relating to the restaurant therefore could have revealed more about the connection between Tai Phan and the restaurant; (iv) the conspiracy involved multiple individuals; (v) Tai Phan was known to use fraudulent credit cards; and (vi) Tai Phan used a cell phone that was in his sister's name. Yet, even assuming, *arguendo*, that these

contentions support a somewhat broader search for documents, it strains credulity to argue that the evidence at issue—restaurant customer sales reports ledgers from the previous 16 months, corporate bank account statements from the previous two years, five years' worth of business deposit records, insurance documents, and a 17–month–old tip record—bore any relationship to the two-to-three-month robbery conspiracy under investigation. This is especially so given that the affidavit is totally devoid of any fact suggesting that Café Dalat was used for any illicit activity. Accordingly, the search conducted by the FBI was overbroad, and the evidence at issue must be suppressed.[17]

## B. The 1997 IRS Search

■ Much of the evidence defendants seek to suppress comes from the 1997 IRS search. This search was based on probable cause derived in part from the fruits of the 1995 FBI search and in part from documents obtained in the 1994 trash cover. Given the illegal overbreadth of the 1995 FBI search, it is therefore necessary to determine whether evidence obtained from the 1997 IRS search must also be suppressed as "fruit of the poisonous tree."

---

**17.** The government necessarily concedes that "[i]f the [C]ourt finds that documents seized by the FBI are outside the scope of the search [warrant], the *Leon* good faith exception would not apply." *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Strand,* 761 F.2d 449, 456 (8th Cir.1985) (holding that *Leon* does not apply where officers seize items not authorized by warrant); *United States v. Fuccillo,* 808 F.2d 173, 177–78 (1st Cir.) (holding that the *Leon* good-faith exception does not apply when agents exceed the authority of a broadly drawn warrant).

Nevertheless, assuming, *arguendo*, that the IRS search warrant authorized the search and seizure of evidence unrelated to Tai Anh Phan's activities in the robbery conspiracy, it is clear, under *Leon,* that a warrant for the

search and seizure of evidence unrelated to Tai Anh Phan would necessarily have been based on an affidavit "so lacking in indicia of probable cause" with respect to the evidence at issue "as to render official belief in its existence entirely unreasonable." *Leon,* 468 U.S. at 922, 104 S.Ct. 3405. Alternatively, the government cannot rely solely on the broad language of Attachment A and without reference to the attached affidavit, for Attachment A, standing alone, would have been "so facially deficient—i.e. in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume·it to be valid." *Id.* "[A] reasonably well-trained officer" in that instance would "have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n. 23, 104 S.Ct. 3405.

*Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). In this regard, it is well-settled that "[t]he inclusion of tainted evidence does not invalidate a search warrant if enough untainted evidence supports it." [18] Thus, the tasks at hand are, first, to identify the portions of Agent Rocawich's affidavit that are tainted by the illegal 1995 FBI search, and, second, to "assess the evidence offered in support of the warrant without considering the information gained from the [illegal search] and ... decide whether the application for a search warrant contains sufficient information, apart from the tainted information, to establish probable cause." [19]

In determining which portions of Agent Rocawich's affidavit are tainted by the 1995 FBI search, it is well to remember that the exclusionary rule prohibits the introduction of derivative evidence that is the product of an illegal search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint." *Nardone,* 308 U.S. at 341, 60 S.Ct. 266 (1939); *see Murray v.*

*United States,* 487 U.S. 533, 536–37, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). While the concept of taint dissipation is conceptually clear, its practical application is less so. But Justice Powell has shed some light on this issue by observing that "[t]he notion of the 'dissipation of taint' attempts to make the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." [20] In other words, suppression of evidence is not necessarily appropriate simply because "it would not have come to light but for the illegal actions of the police." [21] Rather, the proper application of the exclusionary rule to derivative evidence, according to the Supreme Court, requires the trial court to ask "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary

---

**18.** *United States v. Wright,* 991 F.2d 1182, 1186 (4th Cir.1993). This is sensibly so because, as the Fourth Circuit has observed, "[i]t is one thing to say that officers shall gain no advantage from violating the individual's rights," but "it is quite another to declare that such a violation shall put him beyond the law's reach even if his guilt can be proved by evidence that has been obtained lawfully." *Sutton v. United States,* 267 F.2d 271, 272 (4th Cir.1959). Thus, the Supreme Court has recognized a so-called "independent source exception" to the exclusionary rule that "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). In the context of a tainted affidavit, the affidavit essentially is regarded to be an independent lawful source if it gives rise to probable cause notwithstanding the

elimination of the tainted information. *See U.S. v. Gillenwaters,* 890 F.2d 679, 681 n. 3 (4th Cir.1989) (noting that "[t]his is essentially an extrapolation from the [Supreme] Court's holding in *Wong Sun* ... that the exclusionary rule does not apply to evidence traceable to an independent lawful source").

**19.** *United States v. Bynum,* 125 F.Supp.2d 772, 785 (E.D.Va.2000); *see also Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *Gillenwaters,* 890 F.2d at 679 ("[T]he correct course [is] to set aside the suspect material and make a probable cause evaluation based on what remained of the affidavit.").

**20.** *Brown v. Illinois,* 422 U.S. 590, 609, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring).

**21.** *Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. 407.

taint." *Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. 407.[22] This inquiry, in turn, requires the trial court to consider, among other factors, (i) the temporal proximity between the illegal action and the acquisition of the evidence, (ii) "the presence of intervening circumstances," and, particularly, (iii) "the purpose and flagrancy of the official misconduct." *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *United States v. Seidman,* 156 F.3d 542, 549 (4th Cir.1998). These principles, applied here, compel the conclusion that, aside from direct references to the 1995 FBI search or to evidence seized during that search, the remainder of Agent Rocawich's affidavit has been purged of any taint causally attributable to the 1995 FBI search.

To begin with, it is clear that references in Agent Rocawich's affidavit to the 1994 trash cover and to evidence obtained by the FBI by virtue of the trash cover—namely, the Café Dalat daily guest checks used to calculate the 1992 Café Dalat sales receipts figure of $574,019.75—are untainted by any illegality. The seizure of these documents predated and was wholly unrelated to the 1995 FBI search. Accordingly, these documents may appropriately be considered in ascertaining whether Agent Rocawich's affidavit, less its tainted material, states probable cause for the 1997 IRS search.

The analysis might have ended here were it plausible to conclude that the 1994 trash cover documents, by themselves, furnished probable cause for the 1997 IRS search. As it happens, this conclusion is not plausible, for, as defendants properly point out, the untainted Café Dalat guest checks obtained through the 1994 trash cover are in themselves meaningless and do not indicate that a violation of the tax laws has occurred unless they are compared to information contained in Café Dalat's corporate tax returns. And, it is clear that Agent Rocawich would not have obtained the returns and made such a comparison—and therefore would not have concluded that Café Dalat's gross receipts were under-reported on the corporate tax returns—but for the suspicion created by evidence illegally seized in the 1995 FBI search. Indeed, the government does not deny that Agent Rocawich's investigation of defendants for possible violations of the tax laws is causally connected to the 1995 FBI search. Specifically, the IRS pursued an investigation of defendants only after Agent Knowles and the Assistant United States Attorney prosecuting Tai Anh Phan for the robbery conspiracy compared documents seized during the 1995 FBI search with defendants' personal tax returns and determined that "there were some issues regarding taxes and so forth." Moreover, the evidence discloses that the documents seized during the 1994 trash cover, which are undisputably untainted by any illegality, played no role in Agent Knowles's decision to refer the matter to the IRS. Thus, even though Agent Rocawich independently obtained much of the information contained in her affidavit—as was the case with Café Dalat's reported taxable income and gross receipts information, defendants' personal tax return information, bank and other financial records obtained by grand jury subpoena, and currency report information, for example—she did so only after the illegally seized evidence pointed the finger of suspicion at defendants and, as she admits, after she received a "lead" from the illegally seized evidence for each investigatory initiative she undertook.

---

**22.** "[T]he burden of showing admissibility rests … on the prosecution." *Brown,* 422 U.S. at 604, 95 S.Ct. 2254.

Given this, and because Agent Roca-wich's affidavit uses documents illegally seized in the 1995 FBI search—namely, the 1994 through 1995 sales reports ledgers [23]—it becomes critical to determine whether circumstances warrant concluding that the taint attaching to Agent Roca-wich's investigation has been dissipated. To put the question in Justice Powell's terms, it is necessary now to determine whether the deterrent effect of the exclusionary rule is so reduced in the circumstances that its imposition is no longer justified.

■ While it is clear that Agent Roca-wich's investigation is causally connected to the fruits of the 1995 FBI search, it does not necessarily follow that the fruits of her investigation are irrevocably tainted by the illegal 1995 FBI search. This is so because "to grant life-long immunity from investigation and prosecution simply because a violation of the Fourth Amendment first indicated to the police that a man was not the law-abiding citizen he purported to be would stretch the exclusionary rule beyond tolerable grounds." *United States v. Friedland*, 441 F.2d 855, 861 (2d Cir.1971). Thus, it is not enough to show that unlawfully seized information "gives an impetus or direction toward what is to be focused on by the government." [24] Rather, the nexus must be so direct that the application of the exclusionary rule would have a real deterrent effect on the behavior of law enforcement officers, for "[a]s with any remedial device, the application of the rule [should be] restricted to those [situations] where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Friedland*, 441 F.2d at 861 ("Courts must neither so narrow the rule as to impair its presumed deterrent effect nor expand it in such a way that, in order to achieve a marginal increment in deterrence, society will pay too high a price.").

Here, it is clear that suppression of the fruits of Agent Rocawich's investigation and analysis would not further the deterrence goals of the exclusionary rule. First, it must be recognized that significant deterrence is already achieved through the suppression of the specific documents illegally seized during the 1995 FBI search. Thus, the task at hand is to determine the incremental deterrent effect achieved by suppressing the information obtained by Agent Rocawich as derivative evidence of the illegal search. In this regard, it is clear that suppression here

---

**23.** It is beyond dispute that, given the illegality of the 1995 FBI search, all references in Agent Rocawich's affidavit to the search or to records seized by the FBI in that search are tainted and may not be considered in the probable cause calculus for the 1997 IRS search. Thus, the Café Dalat sales receipts figures for the years 1994 and 1995, which Agent Rocawich calculated solely through the use of the illegally seized sales reports ledgers for February 1994 through May 1995, are tainted. Also tainted are references to seized bank statements, which disclosed large cash deposits into accounts held by defendants, and to seized land records, which showed numerous real property purchases.

**24.** *United States v. Smith*, 155 F.3d 1051, 1061 (9th Cir.1998); *see also United States v. Wat-son*, 950 F.2d 505, 508 (8th Cir.1991) ("[W]here a law enforcement officer merely recommends investigation of a particular individual based on suspicions arising serendipitously from an illegal search, the causal connection is sufficiently attenuated so as to purge the later investigation of any taint from the original illegality."); *United States v. Carsello*, 578 F.2d 199 (7th Cir.1978) ("[T]he mere fact that the investigation would not have been undertaken but for the disclosure of the [illegally seized evidence] does not necessarily compel the conclusion that all the evidence discovered in the course of the investigation is therefore suppressible as 'fruit of the poisonous tree.' ").

would achieve only *de minimis*, if any, incremental deterrence, if only for the simple reason that, when the 1995 FBI search occurred, no tax crime had been committed as to the years 1993, 1994, and 1995; Café Dalat's returns for these years were not filed until September 1995, November 1995, and October 1996, respectively. Thus, the FBI agents who seized Café Dalat's February 1994–May 1995 sales reports ledgers, which, along with the 1992 Café Dalat guest receipts obtained through the 1994 trash cover, were the critical information that triggered the IRS investigation and supported probable cause for the 1997 IRS search, could not have foreseen that these documents would ultimately be used derivatively in, or even lead to, an investigation of tax crimes that at the time had yet to be committed.[25] Accordingly, little, if any, deterrence results at the end for the day from the suppression of evidence that, at the time of seizure, was evidence of no crime. The Fifth Circuit has put this point well:

> When the Government is effectively denied the possibility of direct prosecution on the basis of illegally seized evidence, no significant additional deterrent effect could be realized by suppressing the evidence at a trial of the search victim for a crime committed after the illegal search

and with the knowledge that the illegal search occurred.

*U.S. v. Turk,* 526 F.2d 654, 667 (5th Cir. 1976); *see also U.S. v. Finucan,* 708 F.2d 838, 845 (1st Cir.1983). Indeed, a contrary holding potentially could provide those whose financial documents are illegally seized a perverse incentive to commit new crimes on the belief that the initial illegality might immunize them with respect to matters connected to those documents.[26] Consequently, the intervening circumstance of the filing of Café Dalat's allegedly false 1993, 1994, and 1995 corporate tax returns—after defendants knew that the FBI was in possession of 1994 and 1995 sales information—purged whatever taint infected Agent Rocawich's investigation and sufficiently attenuated the causal connection between her investigation and the 1995 FBI search, so that the results of the investigation are properly considered in the probable cause calculus for the 1997 IRS search.[27]

Accordingly, what is left in Agent Rocawich's affidavit for consideration in this calculus are the following facts. The FBI provided Agent Rocawich with the Café Dalat daily guest receipts obtained from a trash cover of defendants' residence. She independently obtained the 1992 corporate income tax return of Café Dalat, which was filed on April 17, 1995, and compared

---

**25.** *See Carsello,* 578 F.2d at 203 (finding that taint caused by illegal search of usury records was sufficiently attenuated as to have been purged in subsequent tax fraud prosecution because "[t]here [was] simply no way that the . . . police officers who seized [the] usury records . . . could have foreseen that they would prove useful in the course of a tax fraud investigation begun six months later").

**26.** *See Finucan,* 708 F.2d at 845; *cf. Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) ("It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can

turn the illegal method by which evidence in the Government's possession was obtained to his own advantage.").

**27.** This result finds significant support in *United States v. Paepke,* 550 F.2d 385 (7th Cir.1977), where the Seventh Circuit held that evidence illegally seized in a state criminal narcotics proceeding was admissible in a subsequent tax fraud prosecution case in federal court because the deterrence policy of the exclusionary rule would not be furthered by suppression when the defendant himself had initiated the action by failing properly to file a federal income tax return. *See id.* at 390–91.

the reported gross receipts from the restaurant ($278,253) and the taxable income ($0.00) for that year with the total amount of sales receipts for 1992 ($574,019.75). This comparison indicated that Café Dalat under-reported its business income for 1992 by approximately $300,000. The corporate returns for the years 1993, 1994, and 1995 report gross receipt and taxable income amounts similar or identical to the amounts in the 1992 return. The 1990 through 1995 corporate income tax returns for Café Dalat were signed by defendant Tu Anh Phan as corporate officer. In addition, defendants' individual income tax returns included large mortgage interest/points deductions that, in Agent Rocawich's experience, did not square with the reported adjusted gross income figures. Her review of bank records she obtained indicated large cash deposits into defendants Tu Anh Phan and Danh Anh Phan's accounts, and the Currency Banking Retrieval System she reviewed showed defendants performing large cash transactions from June 1992 through May 1996. Further, Agent Rocawich's review of public real and personal property records showed significant ownership of property. Finally, records obtained from First Union National Bank indicated that defendants Tu Anh Phan and Danh Anh Phan leased a safety deposit box that had been accessed 112 times from April 1992 through March 1997, and that on four occasions access to the box corresponded with a deposit into a checking account held in these defendants' names. This untainted information clearly is ample to support probable cause to believe that a violation of 26 U.S.C. § 7201 had occurred. Moreover, because "[a]ny conduct, the likely effect of which would be to mislead or conceal," is probative to proving the willfulness of an attempt to evade taxes, this information also establishes probable cause as to evidence relating to the years 1993, 1994, and 1995 obtained through the IRS search warrant.[28]

### III.

For these reasons, defendants' motion to suppress must be **GRANTED IN PART AND DENIED IN PART.** The motion must be granted insofar as the government seeks to introduce documents and other evidence seized during the 1995 FBI search. The motion must be denied in all other respects and, in particular, is denied with respect to evidence seized in and developed as a result of, or in connection with, the 1997 IRS search. In addition, defendants' motion for reconsideration must be **DENIED.**

An appropriate Order has been issued as to defendants' suppression motion, and an appropriate Order shall issue as to defendant's motion for reconsideration.

---

**28.** *Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943). In this regard, evidence showing that defendants "ke[pt] a double set of books, ma[de] false entries or alterations, or false invoices or documents, dest[royed] ... books or records, conceal[ed] ... assets or cover[ed] up income sources, handl[ed] ... one's affairs to avoid making the records usual in transactions of the kind, and [performed acts] the likely effect of which would be to mislead or conceal" is relevant evidence to the 1992 Section 7201 violation for which there was probable cause.

*Id.; see also United States v. Kim,* 884 F.2d 189, 192 (5th Cir.1989) (evidence of a consistent pattern of under-reporting large amounts of income and of expenditures of large amounts of cash irreconcilable with income); *United States v. Woodner,* 317 F.2d 649, 651 (2d Cir.1963) (evidence of property placed in the name of another); *United States v. Daniel,* 956 F.2d 540 (6th Cir.1992) (extensive use of currency and cashier's checks); *United States v. Magnus,* 365 F.2d 1007 (2d Cir.1966) (prior or subsequent acts reasonably proximate to prosecuted year).